## AFFIDAVIT IN SUPPORT OF COMPLAINT

Your affiant, **ATF Special Agent Lamar Reddick**, deposes and states as follows:

1.	I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since December, 2013.  As part of my duties as an ATF agent, I investigate criminal violations relating to firearms, narcotics, and explosives trafficking offenses.  In conducting these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, and the use of confidential sources and informants.  Through these investigations, my training and experience, and conversations with other special agents and law enforcement personnel, I have become familiar with methods used by explosives traffickers to safeguard their illegal activities.

2.	As an ATF Special Agent, your affiant is trained in investigating violations of Title 18 United States Code, Section 842(a)(1), which makes it unlawful to engage in the business of importing, manufacturing, or dealing explosive materials without a Federal explosives license issued by ATF.

3.	Your affiant knows through training, knowledge and experience that illegal explosive devices are often constructed by persons who obtain certain chemicals, commonly called explosive precursor chemicals, through online or mail order.  In their component form, these chemicals are not considered explosive materials and thus are not regulated by ATF.  However, once combined or mixed, an explosive material commonly referred to as "flash powder" can be produced.  Flash powder is classified as an explosive under Title 27, Code of Federal Regulations, Part 55, Subpart K, Section 55.201(a) and is thus subject to Federal manufacturing requirements.  Flash powder is also subject to Federal explosives storage

requirements as defined in Title 27 Code of Federal Regulations, Part 55, Subpart K.  Flash powder devices can be small or large.  These devices can blow up cars, homes, and be used to kill or maim individuals.

4.     Your affiant knows that flash powder is used, by licensed persons, in the legal manufacture, distribution and use of explosives such as display fireworks.  However, flash powder has also been used by unlicensed persons in the unlicensed, unregulated and unlawful manufacture of explosive devices for sale to or use by unlicensed persons in the general public. Persons who manufacture such devices place flash powder into a container such as a sealed cardboard tube.  A fuse or wick is inserted into the tube which is intended to be initiated with open flame.  This wick is designed to burn to the point where it reaches the explosive contained inside the tube and whereby the explosive is initiated.  Once initiated, the devices can explode with significant force.  Unlike lawfully manufactured "commercial" explosives, which are generally designed to be insensitive to flame, these devices are considered "flame sensitive" and thus relatively easy for persons not specifically trained in the use of explosives to initiate. Furthermore, these explosive devices are commonly made in a clandestine manner (in homes, barns, garages, etc.) with disregard to the safety of persons who may be residing nearby. Through their unlicensed and unregulated manufacture, sale and storage, these devices are referred to as "illegal homemade explosive devices" by ATF.

**Background on Legality of Explosives and Explosives Materials**

5.     18 U.S.C. § 842(a) prohibits various activities involving the distribution, transportation, storage, and manufacture of explosives without a license or permit.  18 U.S.C. §

841(d) defines an explosive as "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion[.]" 18 U.S.C. § 841(d) grants the Attorney General (through the ATF) the authority to create and publish an annual list of materials that qualify as explosives. Flash powder, which is commonly created by mixing an oxidizer such as potassium perchlorate with a fuel such as aluminum, is designated as an explosive by the ATF pursuant to § 841.

**February 10, 2019 Controlled Purchase by CS1 from MIDDLEMAN**

6.        In early February of 2019, ATF agents met with a confidential informant (CS1). CS1 reported that a male (referred to hereinafter by the pseudonym of "MIDDLEMAN") was offering to sell homemade explosive devices in the Warren, Ohio, area. CS1 reported that MIDDLEMAN was offering to sell a lot of 30 to 35 homemade explosive devices for $300 to $500. CS1 stated that he/she had previously met with MIDDLEMAN and one of MIDDLEMAN's associates. MIDDLEMAN's associate showed CS1 a video of one of the homemade explosive devices being used to blow up a barbeque grill. CS1 provided that video to the agents. Agents showed CS1 a photograph of the individual they believed to be MIDDLEMAN. CS1 identified MIDDLEMAN from the photograph. A federal licensing system query indicates that MIDDLEMAN does not possess a Federal Explosives License. Additionally, CS1 does not possess a Federal Explosives License.

7.        On or about February 10, 2019, ATF agents used CS1 to make a controlled purchase of eleven (11) homemade explosive devices from MIDDLEMAN in Warren, Ohio. MIDDLEMAN arrived at the controlled buy in his vehicle. CS1 approached MIDDLEMAN's

3

vehicle. MIDDLEMAN lowered his window and handed CS1 two plastic Ziploc bags

containing eleven (11) homemade explosive devices. During the controlled purchase,

MIDDLEMAN told CS1 that he was acting as an intermediary and was not the manufacturer of

the devices. CS1 met with ATF agents afterward and provided the 11 devices, which were

stored in ATF custody.

8.     On or about February 28, 2019, CS1 contacted ATF agents to report that

MIDDLEMAN was leaving the State of Ohio. CS1 was able to convince MIDDLEMAN to

provide him/her with the phone number for MIDDLEMAN's explosive device supplier.

MIDDLEMAN provided CS1 with his supplier's phone number (330-***-****) and stated that

his supplier's name was "Donnie." MIDDLEMAN told CS1 that he would contact Donnie and

let Donnie know to expect CS1's call.

9.     ATF queried Donnie's phone number through a law enforcement database, which

indicated that the subscriber was Donald Phillips ("PHILLIPS"), DOB **/**/1992, the same

individual named in this complaint and arrest warrant.

10.    A federal licensing system query indicates that PHILLIPS does not possess a

Federal Explosives License.

11.    After obtaining PHILLIPS's cell phone number, a law enforcement officer posed

as an explosives buyer and used an undercover cell phone to call PHILLIPS's cell phone.

PHILLIPS answered the phone and confirmed that he was "Donnie." The undercover officer

told PHILLIPS that he/she got his phone number from MIDDLEMAN. PHILLIPS stated that he

preferred to text rather than talk, so the conversation ended.

4

**March 20, 2019 Controlled Purchase by UC-1 from PHILLIPS**

      12.    Following the initial phone call to PHILLIPS from the undercover phone, PHILLIPS replied via text message to the undercover law enforcement phone on March 15, 2019:

> *PHILLIPS (5:38 p.m.): sup*
>
> *PHILLIPS (5:39 p.m.): I got stuck at work Wednesday till 8*

      13.    An ATF Special Agent working in an undercover capacity ("UC-1") then began using the undercover phone to respond to PHILLIPS.  The following text message conversation took place on March 17, 2019:

> *UC-1 (2:17 p.m.): Yo no worries*
>
> *UC-1 (2:18 p.m.): I ended up having to make an extra run anyway*
>
> *PHILLIPS (2:22 p.m.): so jus let me kno when's good n well try to make something happen*
>
> *UC-1 (3:06 p.m.): Ok maybe Wednesday?*
>
> *PHILLIPS (3:07 p.m.): I get off at 5*
>
> *UC-1 (3:08 p.m.): ok*

      14.    On March 18, 2019, starting at approximately 2:15 p.m., UC-1 texted PHILLIPS and had the following conversation via text message about purchasing explosive devices:

> *UC-1 (2:15 p.m.): I'm good for Wednesday*
>
> *PHILLIPS (5:20 p.m.): ok*
>
> *UC-1 (7:08 p.m.): 35 of the big ones?*

*PHILLIPS (7:08 p.m.): biggest I got*

15.     On March 20, 2019, starting at approximately 9:05 a.m., UC-1 texted PHILLIPS and had the following conversation via text message:

*UC-1 (9:05 a.m.): Still good for 5?*

*PHILLIPS (9:22 a.m.): yea*

*UC-1 (9:28 a.m.): Where you wanna meet at*

*UC-1 (9:29 a.m.): the mall?*

*PHILLIPS (9:34 a.m.): hbu my shop*

*PHILLIPS (9:35 a.m.): 624 robbins av niles oh 44446*

*UC-1 (9:40 a.m.): I'm gonna be coming down 422*

*PHILLIPS (11:08 a.m.): And I'll be on Robbins so come to Robbins Ave*

*PHILLIPS (11:17 a.m.): I got a run home and get the fireworks in my shop is probably about middle between my house n the mall*

*UC-1 (11:18 a.m.): Ok*

16.     On this same date starting at approximately 4:32 p.m., UC-1 texted PHILLIPS and had the following conversation via text message:

*UC-1 (4:32 p.m.): I'll be there pretty soon*

*UC-1 (4:32 p.m.): You still have to run home?*

*PHILLIPS (5:02 p.m.): yea*

*UC-1 (5:04 p.m.): I'll be there in 10*

*UC-1 (5:14 p.m.): I'm in the lot*

6

*PHILLIPS (5:16 p.m.) I'm on my way*

*UC-1 (5:17 p.m.): ok*

17.     On this same date, at approximately 5:17 p.m., PHILLIPS met UC-1 in the parking lot of PHILLIPS's workplace: Berena's Automotive Center, 624 Robbins Avenue, Niles, Ohio, 44446.  UC-1 was equipped with a recording device to record the purchase.  PHILLIPS arrived in a Jeep Cherokee SUV, bearing Ohio license plate number GRD6976.  PHILLIPS pulled his vehicle up in a manner so that his driver's side window was next to UC-1's driver's side window.  PHILLIPS handed UC-1 a bag of illegal homemade explosive devices through the driver's side window.  PHILLIPS stated the devices were the largest size he currently had. PHILLIPS stated he can make larger devices, possibly up to "double sticks."[1]  PHILLIPS told UC-1 if he wanted to purchase any larger devices, he would have to provide money up front, to at least cover the cost of the tubes.

18.     UC-1 asked PHILLIPS what he was using for the mixture inside of the devices, to which PHILLIPS replied; "It's two powders and you mix em seventy thirty."[2]

19.     UC-1 stated he would like to purchase more devices and also had a friend who would possibly want to purchase some as well.  PHILLIPS stated he had more "quarter sticks." PHILLIPS stated if UC-1 wanted to purchase any larger devices it would take approximately a

---

[1] Terms such as "quarter stick," "half stick," and "double stick" are commonly used to refer to the size of a homemade explosive device.

[2] It is common to make flash powder using a mixture of 70% oxidizer, such as potassium perchlorate, and 30% fuel, such as aluminum powder.

week or week and a half to receive the materials and then only a couple of days to assemble the devices.

20.     UC-1 examined the contents of the bag and counted only thirty (30) devices, not the previously agreed upon number of thirty-five (35).  UC-1 stated he would only pay $180.00 for thirty (30) of the devices and PHILLIPS agreed.  UC-1 paid PHILLIPS with the pre-recorded government funds.

21.     UC-1 stated he would contact PHILLIPS soon and possibly set up something for the following week.  PHILLIPS stated he had more devices of the size UC-1 just purchased but did not have any "quarters" and he needed to make more.

**March 28, 2019 Controlled Purchase by UC-1 from PHILLIPS**

22.     On March 25, 2019, at approximately 1:58 p.m., UC-1 and PHILLIPS had the following text message conversation:

> *UC-1 (1:58 p.m.): Yo*
>
> *PHILLIPS (2:40 p.m.): Sup*
>
> *UC-1 (3:57 p.m.): You still got those quarters you were talking about?*
>
> *PHILLIPS (4:03 p.m): yea n more of the same u got last time*
>
> *UC-1 (5:19 p.m.): I might be around Thursday*
>
> *UC-1 (5:20 p.m.): I'll let you k ow*
>
> *UC-1 (5:20 p.m.): Is there any way we can do it before 5*
>
> *PHILLIPS (5:48 p.m.): maybe*

8

*PHILLIPS (5:48 p.m.) but I don't have any quarters made up*

23.     On March 26, 2019, starting at approximately 9:03 a.m., UC-1 and PHILLIPS had the following conversation via text message:

*UC-1 (9:03 a.m.): How many of the ones I got last time*

*PHILLIPS (9:50 a.m.): not sure I'll look later*

*UC-1 (9:50 a.m.): ok let me know*

24.     On March 26, 2019, at approximately 4:33 p.m., UC-1 received a phone call from PHILLIPS.  UC-1 answered the call and PHILLIPS stated he had one hundred and three (103) of the same sized explosive devices that UC-1 purchased last time.  PHILLIPS stated he would sell the devices to UC-1 for $550.00.

25.     On March 27, 2019, at approximately 7:06 p.m. PHILLIPS placed a phone call to UC-1.  UC-1 was unable to answer the call but attempted to return the phone call at 7:11 p.m. but PHILLIPS did not answer.

26.     On this same date, starting at approximately 7:12 p.m., UC-1 texted PHILLIPS and had the following conversation via text message:

*UC-1 (7:12 p.m.): I should be coming through there around 1230 or 1*

*tommorrow*

*UC-1 (7:15 p.m.): I can take em all*

*PHILLIPS (11:34 a.m.): okkk*

27.    On March 28, 2019, starting at approximately 12:12 p.m., UC-1 texted PHILLIPS and had the following conversation via text message:

> *UC-1 (12:12 p.m.): 10 mins*
>
> *PHILLIPS (12:13 p.m.): okk*
>
> *UC-1 (12:22 9.m.): okkk*

28.    UC-1 traveled to the parking lot of Berena's Auto Center, the site of the previous controlled buy, and waited for PHILLIPS.  After a short time PHILLIPS emerged from the bay doors of the Auto Center.  PHILLIPS told UC-1 to come over to his vehicle.  UC-1 approached the same Jeep Cherokee that PHILLIPS had arrived in during the last transaction.  PHILLIPS retrieved a garbage bag from the back seat of the Jeep and brought it to the driver's seat. PHILLIPS removed three zip lock bags from the garbage and began counting the devices.  Two of the bags contained thirty-five (35) devices and one contained thirty-three (33) devices (total of 103 devices).  PHILLIPS stated: "I made sure I fuckin' double counted, I didn't want to look like an ass hole twice."

29.    PHILLIPS explained that he had another person who often purchases these same types of devices from him.  PHILLIPS stated this other individual usually purchases around $3,500.00 worth of devices and often times gives PHILLIPS a portion of the money up front to purchase materials.  PHILLIPS stated the other purchaser still had some larger devices and was interested selling them to UC-1.

30.    UC-1 examined the contents of the bag and counted one hundred and three (103). UC-1 paid PHILLIPS $550.00 with the pre-recorded government funds.

31.    The transaction was completed at approximately 12:31 p.m., PHILLIPS re-entered Berena's Auto Center and UC-1 departed the scene.

**April 30, 2019 Controlled Purchase by UC-1 from PHILLIPS**

32.    On or about April 26, 2019, PHILLIPS contacted UC-1 using the same phone mobile number (330-***-****) and offered to sell four-hundred (400) homemade explosive devices. Due to concerns about ATF storing that large of a number of explosive devices, UC-1 agreed to buy one-hundred (100) illegal homemade explosive devices for $250.00. The buy was arranged for April 30, 2019.

33.    On April 30, 2019, ATF S/A Reddick conducted mobile surveillance of Donald PHILLIPS at his residence of 740 Salt Springs Road, Mineral Ridge, OH. At approximately 7:04 a.m., S/A Reddick witnessed PHILLIPS exit his residence and enter his vehicle, the Jeep Cherokee, Ohio license plate GRD6976. PHILLIPS drove Eastbound on Salt Springs Road until reaching South Main Street. PHILLIPS turned North onto South Main Street and continued North until reaching East State Street Southeast. PHILLIPS turned East onto East State Street Southeast until reaching Robbins Ave. PHILLIPS traveled East on Robbins Ave until reaching Berena's Automotive Center, his place of employment. PHILLIPS parked his vehicle and entered Berena's.

11

34.     S/A Reddick maintained surveillance on PHILLIPS'S parked vehicle until S /A Duffalo relieved him at approximately 10:00am.  S/A Duffalo maintained surveillance on PHILLIPS's vehicle until the conclusion of the controlled undercover buy, which took place at approximately 2:52 pm.

35.     At approximately 2:52 pm, UC-1 purchased one hundred (100) illegal homemade explosive devices from PHILLIPS for $250.00.  PHILLIPS exited Berena's and retrieved the illegal homemade explosive devices from his vehicle.  PHILLIPS then provided the devices to UC-1 in two (2) plastic bags containing fifty (50) devices each. UC-1 provided PHILLIPS with the government funds to conclude the transaction.

36.     At no point during period of surveillance by S/A Reddick or S/A Duffalo did PHILLIPS or any other individual interact with his vehicle prior to the controlled UC buy.  As such, PHILLIPS likely brought the explosive devices with him in his vehicle when he left his residence for work in the morning.

37.     The devices purchased from PHILLIPS by UC-1 appear to be of the same type (color, size, structure) as the devices purchased on previous occasions.

**Forensic Examination of Explosives Purchased from MIDDLEMAN and PHILLIPS**

38.     On March 26, 2019, ATF Special Agent Lucas Battani, a Certified Explosives Specialist / Bomb Technician, disassembled several of the explosive devices purchased from MIDDLEMAN on February 10th and from PHILLIPS on March 20th.  Each device was encased in a red-white-and-blue cardboard tube, had a hobby fuse protruding from the center, and contained a filler that appeared to be flash powder.  The sizes of the sampled devices ranged

12

from 2 and 3/16th inches to 6 inches.  The amount of suspected flash powder in each sampled device ranged from approximately 8 grams to 56 grams.  By comparison, consumer ground fireworks sold in stores may contain no more than 50 milligrams (0.05 grams) of flash powder each.

39.     ATF also sent several of the devices purchased from MIDDLEMAN on February 10th and PHILLIPS on March 20th and 28th to a lab for a forensic analysis.  An ATF Forensic Chemist analyzed the powder contained in several of those devices and determined that they contained a perchlorate explosive mixture (flash powder) of potassium perchlorate and aluminum.  The flash powder contained in the devices qualifies as an explosive under 18 U.S.C. § 841(d).

40.     Below is a photograph of two of the explosive devices purchased from PHILLIPS during one of the controlled buys, which are representative of the devices purchased from PHILLIPS and MIDDLEMAN during this investigation.  All of the devices purchased appear to have the same red, white, and blue casing, as well as a fuse protruding from each.  The only significant differences among the devices purchased are their size and the amount of flash powder contained in each.



**CONCLUSION**

41.     Based on the above listed facts, your affiant submits that there is probable cause

to believe that from February 2019 through April 2019, DONALD PHILLIPS did engage in the

business of manufacturing or dealing in explosive materials without a license, in violation of 18

U.S.C. § 842(a)(1).

42.     Your affiant further requests that an arrest warrant be issued for DONALD

PHILLIPS.

14

Respectfully submitted,

Lamar Reddick
Special Agent
Bureau of Alcohol

Subscribed and sworn to before me
on May 2, 2019:

George J. Limbert
UNITED STATES MAGISTRATE JUDGE

15